## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION AT CINCINNATI

**RONALD P.,**[1]

      **Plaintiff,**

                              **Civil Action 1:22-cv-163**
                              **Magistrate Judge Elizabeth P. Deavers**

  **v.**

**COMMISSIONER OF**
**SOCIAL SECURITY,**

      **Defendant.**

### <u>OPINION AND ORDER</u>

Plaintiff, Ronald P., brings this action under 42 U.S.C. §§ 405(g) and 1383(c)(3) for review of a final decision of the Commissioner of Social Security ("Commissioner") denying his application for Social Security Supplemental Security Income benefits ("SSI"). This matter is before the Court for consideration of Plaintiff's Statement of Errors (ECF No. 8), the Commissioner's Memorandum in Opposition (ECF No. 11), Plaintiff's Reply (ECF No. 12), and the administrative record (ECF No. 7). For the reasons that follow, the Court **OVERRULES** Plaintiff's Statement of Errors and **AFFIRMS** the Commissioner's decision.

### I.      BACKGROUND

Plaintiff filed his current application[2] for SSI on January 22, 2015, alleging that he has been disabled since that date due to depression, anxiety, bipolar disorder, Hepatitis C, arthritis in his neck and back, degenerative disc disease, high blood pressure, and a fractured rib. (R. at

---

[1] Pursuant to General Order 22-01, due to significant privacy concerns in social security cases, any opinion, order, judgment or other disposition in social security cases in the Southern District of Ohio shall refer to plaintiffs only by their first names and last initials.

[2] The record contains an unrelated administrative decision from Administrative Law Judge John Pope, dated January 26, 2012. (*See* R. at 107-126.)

219-231, 242.) Plaintiff's application was denied initially in June 2015 and upon reconsideration in October 2015. (R. at 127-164.) Plaintiff sought a *de novo* hearing before an administrative law judge. (R. at 165-178.) Plaintiff, who was represented by counsel, appeared and testified at a hearing held on July 25, 2017. (R. at 72-106.) A Vocational Expert ("VE") also appeared and testified. (*Id.*) Administrative law judge Renita K. Bivins (the "ALJ") issued a decision finding that Plaintiff was not disabled within the meaning of the Social Security Act on October 18, 2017. (R. at 52-71.) On March 29, 2018, the Appeals Council denied Plaintiff's request for review and adopted the ALJ's decision as the Commissioner's final decision. (R. at 1-6.)

Thereafter, on March 24, 2018, Plaintiff appealed the final decision of the Commissioner to this Court. *See [Ronald P.] v. Comm'r of Soc. Sec.*, S.D. Ohio Case. No. 1:18-cv-281. On September 29, 2019, this Court remanded the case to the Commissioner, finding that the ALJ's articulated reasons for rejecting the treating source opinions did not constitute "good reasons" for rejecting all of her findings. (R. at 478-498.) After the Appeals Council issued a remand order, the ALJ held a second hearing via telephone. (R. at 422-450.) A VE again appeared and testified. (*Id.*) On January 24, 2022, the ALJ issued a second decision finding that Plaintiff was not disabled within the meaning of the Social Security Act. (R. at 398-421.) Plaintiff did not request review by the Appeals Council, opting instead to directly file the instant suit in this Court on March 29, 2022. (ECF No. 1.)

## II.     RELEVANT RECORD EVIDENCE

### A.     Hearing Testimony

The ALJ summarized Plaintiff's relevant hearing testimony as follows:

At the remand hearing, [Plaintiff] testified that he is married and his wife receives disability benefits of $700 a month. He stated he worked as a delivery driver for Door Dash in Cincinnati from March 2021 through December 2021. [Plaintiff] acknowledged that he continues to smoke a half-pack of cigarettes per day. He reported that he receives treatment from his primary care physician, Dr. Heather Owens, for hypertension, pain, neuropathy, mental health, restless leg syndrome, and rheumatoid arthritis. [Plaintiff] testified he could not recall the name of his medications because he no longer receives Medicaid and is out of medications, except for some residuals. He noted his pain medications helped in the past. Specifically, [Plaintiff] testified that his pain medications help[], and his pain is reduced. When he was taking medication, it helped his neuropathy, Lyrica reduced his neuropathic pain. He testified his doctors have not recommended any other treatment for his neuropathy other than medication. He testified that he stopped physical therapy but could not recall the exact date. He denied using an assistive device, TENS unit, or brace. [Plaintiff] described his mid to lower back pain as a 7 on a scale of 0 to 10 since 2015. He also rated his neuropathic leg and foot pain as a 7/10. He stated his hypertension has never been stable. [Plaintiff] indicated he no longer has his anxiety medication to help him calm down. He stated his attention and concentration have gotten worse, but he could not pinpoint when or provide any examples. He stated he has not had inpatient treatment for mental health issues, and he has not been treated by psychiatrist or psychologist. He reported difficulty sleeping, but he does not take any medication. He could not remember the last time he drank alcohol, but stated he just quit.

Functionally speaking, [Plaintiff] testified he is able to dress himself, feed himself, shower, and use the bathroom with no problems. Since his alleged onset date, [Plaintiff] stated he watches television to entertain himself. He noted he cooks simple meals using a microwave. He acknowledged he can sweep, vacuum, and perform laundry-related activities if needed. He claimed his wife and mother did the grocery shopping. [Plaintiff] reported spending time with his wife, mother-in-law, and mother. However, he noted his wife is currently in a medically induced coma at the hospital.

(R. at 407-408.)

## B.    Relevant Medical Records

The ALJ summarized the relevant medical records concerning Plaintiff's physical

impairments as follows:

The record indicates [Plaintiff] was instructed to quit drinking in January 2020 and was given Librium to wean himself off. [Plaintiff] declined outpatient rehabilitation. His liver function tests were elevated in September 2020 and he was

again advised to avoid alcohol. Nevertheless, Dr. Owens' progress notes document [Plaintiff] continued to drink "occasionally" through May 2021.

\*\*\* [Plaintiff] told Dr. Owens in May 2021 that his neuropathy symptoms had significantly improved on Lyrica. \*\*\*

Just prior to the alleged onset date, in November 2014, Dr. Zmora performed a clinical examination is which he found a full range of motion in the extremities with no edema, 5/5 strength, and a slight resting tremor. Lumbosacral x-rays revealed mild degenerative changes at L3-4 and L4-5. Also, cervical x-rays showed straightening with mid-lower degenerative changes at C5-6 and C6-7.

In June 2015, an EMG revealed peripheral neuropathy with no lumbosacral radiculopathy. In September 2015, Tamer Abou-Elsaad, M.D., a neurologist, diagnosed unspecified hereditary and idiopathic peripheral neuropathy. On examination, he found [Plaintiff] to have 5/5 motor strength in all four extremities, decreased sensation below the knees, decreased reflexes in the extremities, and a steady gait. He prescribed Gabapentin and daily aspirin, in addition to the previously prescribed medications.

In September 2015, Jennifer Wischer Bailey, M.D., a consultative examiner, observed a range of motion in the cervical and lumbar spines, but he ambulated with a normal gait, and gasp strength was well preserved over the upper extremities. In addition, manipulative ability was normal and there was no muscle atrophy. Also, straight leg raising was normal and there was no evidence of muscle weakness or atrophy on neurological examination. However, she noted diminished pinprick in the bilateral lower extremities. Based on this examination, she diagnosed peripheral neuropathy in the lower extremities, neck pain with left-sided radiculopathy, and low back pain with a normal examination.

Primary care records from Heather Owens, M.D. contained unremarkable physical exam findings during the first half 2017. [Plaintiff] was in a motor vehicle accident in June 2017 and injured his neck, right shoulder, and lower back. He displayed tenderness and decreased range of motion in these three areas. Dr. Owens prescribed a Medrol Dospack and ordered x-rays. [Plaintiff] followed up with Dr. Owens in September 2017 and his symptoms were unchanged. He exhibited similar clinical exam findings as well.

Karen Scholl, PT conducted a Functional Capacity Evaluation with [Plaintiff] in June 2017. Ms. Scholl noted [Plaintiff's] decreased sensation to pinprick and light touch in his lower extremities and feet. She noted [Plaintiff's] gait was unsteady. Ms. Scholl also stated [Plaintiff's] fine motor skills were slowed by about 30%, but equal bilaterally.

In May 2018, [Plaintiff] told Dr. Owens he was doing well with his current medications. He reported restless leg symptoms, but his musculoskeletal and

neurologic exam findings were normal. Dr. Owens prescribed Requip for restless leg syndrome.

[Plaintiff] did not report any neurological symptoms at a routine exam with Dr. Owens in July 2019. Once again, his physical exam findings were unremarkable.

[Plaintiff] presented to the emergency department after he lost consciousness in December 2019. He acknowledged drinking 12 beers per day. His neurologic exam findings were normal. An EKG showed no evidence of acute ischemia. Imaging showed no acute abnormalities in [Plaintiff's] lumbar spine, head, or chest. The discharge diagnoses were hyponatremia and syncope, likely related to alcohol consumption. He was treated with intravenous fluids and referred back to his primary care physician.

When [Plaintiff] followed up with Dr. Owens in January 2020, he had normal strength and reflexes. He had no sensory deficits, normal muscle tone, and normal coordination.

He returned to the emergency department after another syncopal episode and seizure later in January 2020. [Plaintiff] reported daily drinking of 15-20 beers. He displayed intact sensation, motor function, and coordination on exam. CT scan of [Plaintiff's] neck and head found no acute abnormalities.

Dr. Abou-Elsaad conducted a neurological consult with [Plaintiff] shortly after his syncopal episode and seizure in January 2020. [Plaintiff] did not report any other symptoms. [Plaintiff] demonstrated 5/5 strength in all extremities; normal muscle tone; normal reflexes; normal coordination; normal sensation in the arms and legs; and a steady gait. Dr. Abou-Elsaad diagnosed [Plaintiff] with acute encephalopathy, possible syncope, chronic alcohol use, and hypertension. He recommended EEG testing, which came back normal with no evidence of epileptiform discharges.

[Plaintiff] complained of worsening neuropathy at a well visit with Dr. Owens in August 2020. He also reported itchy blisters on his hands and a skin lesion on his upper back. On exam, his muscle tone, coordination, and reflexes were all normal. Dr. Owens increased [Plaintiff's] Neurontin prescription for peripheral neuropathy and prescribed Kenalog cream for eczema. In February 2021, [Plaintiff] said his neuropathy was the same if not worse. Dr. Owens started [Plaintiff] on Lyrica. Three months later, in May 2021, [Plaintiff] reported his neuropathy symptoms were significantly improved on Lyrica. His physical exam findings were unremarkable.

Based on the imaging showing mild cervical and lumbosacral degeneration, correlated by Dr. Bailey's clinical findings, the record supports severe spinal impairments. In addition, while the EMG supports a diagnosis of below the knee peripheral neuropathy, it also undermines Dr. Bailey's finding of left-sided radiculopathy. However, despite these supported diagnoses, the record does not

5

support the degree of alleged debilitation. Other than isolated findings from the one-time consultative examiner in September 2015 and an FCE from a physical therapist in June 2017, the longitudinal medical evidence indicates [Plaintiff] maintained normal motor function and sensation despite his peripheral neuropathy.

(R. at 408-410 (internal citations omitted).) The ALJ summarized the relevant medical records concerning Plaintiff's mental impairments as follows:

[J]ust prior to the alleged onset date, in November 2014, Dr. Zmora diagnosed anxiety and treated with Lexapro. Dr. Oded Zmora found [Plaintiff] alert and oriented. Dr. Oded Zmora also noted [Plaintiff] as having no barriers to learning methods of talk and printed material with readiness to learn.

Dr. Heather Owen, treating physician at Bethel Regional Family Healthcare, note no barriers to learning methods of talk and printed material with readiness to learn. Similarly, Bethel Regional Family Healthcare examination concluded that psychiatrically [Plaintiff] was found to have normal judgment and insight, normal orientation, normal memory and normal mood and affect.

In May 2015, Dr. Twehues, a psychologist and consultative examiner, found [Plaintiff] to be pleasant and cooperative, speech was clear and understandable, and he was alert, responsive, and fully oriented. However, she also noted that his mood was depressed and he was tense and restless. Also, she estimated the intellectual abilities to fall within the borderline to low/average range. Based on the evaluation, she diagnosed moderate, major depressive disorder, panic disorder, and attention-deficit/hyperactivity disorder.

In September 2015, Dr. Elsaad found [Plaintiff] to be fully oriented with an appropriate mood, and an intact memory. Also in September 2015, Dr. Bailey observed [Plaintiff's] normal mental status and intellectual functioning, although he was slightly anxious and had bilateral hand tremors.

Dr. Owen's primary care records consistently noted [Plaintiff's] normal mood and affect at exam from 2017 through 2021. 2017-2021 [sic], she also found [Plaintiff] in no distress, alert and oriented to person, place and time with normal behavior, normal thought content and judgment.

[Plaintiff] displayed an intact memory and a normal attention span at a neurological consult with Dr. Abou-Elsaad in January 2020.

(R. at 410-411 (internal citations omitted).) The ALJ then reviewed the medical source opinions of record as follows:

As for the opinion evidence, the State agency medical consultants, Gerald Klyop, M.D. and Williams Bolz, M.D., reviewed [Plaintiff's] file at the initial and reconsideration levels, respectively. Dr. Klyop opined that [Plaintiff] retained the physical ability to lift and carry 50 pounds occasionally and 25 pounds frequently; stand and/or walk for about 6 hours in an 8-hour workday; sit for about 6 hours in an 8-hour workday; frequently stoop, crouch, or climb ramps and stairs; occasionally kneel, crawl, or climb ladders, ropes or scaffolds; and frequently overhead reach. Dr. Bolz reviewed additional evidence and postural limitation for [Plaintiff] to only frequently climbing ladders, ropes, or scaffolds. These opinions are given only some weight, as they do not accurate reflect the postural restrictions from the prior residual functional capacity. Considering the longitudinal record, while the EMG was positive for peripheral neuropathy, the minimal treatment notes do not show a regularly abnormal gait, muscle atrophy, or muscle weakness. In addition, spinal imaging showed only mild cervical and lumbosacral conditions. Thus, the preponderance of the record does not support an exertional, postural, or manipulative divergence from the prior residual functional capacity. However, considering the physical and mental impairments, in combination, the undersigned as added a 4% off task restriction.

The consultative psychological examiner, Jessica Twehues, Psy.D., offered a Functional Assessment in May 2015. She opined [Plaintiff] was likely to be prone to some forgetfulness and require instructions to be repeated on a few occasions. She further opined [Plaintiff] was likely to have difficulties sustaining focus for prolonged periods of time and was likely prone to high rates of absenteeism from work due to panic disorder. She added [Plaintiff's] work pace was expected to be mildly slowed due to depressed mood. Dr. Twehues stated [Plaintiff] was likely prone to agitated outbursts and likely to present as defensive in response to criticism. Finally, Dr. Twehues said [Plaintiff] was likely to experience increased panic attacks in response to workplace pressures. She noted that increased stress and pressure would increase [Plaintiff's] anxiety and depressive and lead to more problems with concentration and work pace. Dr. Twehues' opinions are given little weight. She saw [Plaintiff] one time and not in a treating context. Her opinions are vague not vocationally relevant. They are inconsistent with [Plaintiff's] minimal psychiatric treatment. They are inconsistent with [Plaintiff's] presentation at the physical examination with Dr. Wischer Bailey, where [Plaintiff's] mental status and intellectual functioning appeared normal. They are inconsistent with progress notes from [Plaintiff's] neurologist, Dr. Abou-Elsaad, who recorded [Plaintiff's] intact memory and normal attention span. Moreover, they are inconsistent with primary care records from Dr. Owens, who repeatedly documented [Plaintiff's] normal mood and affect. 2017-2021 [sic], Dr. Owens also found [Plaintiff] in no distress, alert and oriented to person, place and time with normal behavior, normal thought content and judgment.

Jennifer Wischer Bailey, M.D. examined [Plaintiff] in September 2015 and diagnosed him with alcoholism; peripheral neuropathy, lower extremities; neck

7

pain with left-sided radiculopathy; low back pain; and hypertension. Dr. Wischer Bailey opined [Plaintiff] appeared capable of performing a mild to moderate amount of sitting, ambulating, standing, bending, kneeling, pushing, pulling, lifting, and carrying heavy objects. She further opined [Plaintiff] had no difficulty reaching, grasping, and handling objects. She assessed no visual, communication, or environmental limitations. Dr. Wischer Bailey's opinion, is vague in that she did not objectively define what she meant by "mild to moderate amount of sitting, ambulating, standing, etc." Nevertheless, the opinion is given some weight as it is supported by her physical exam findings noting [Plaintiff's] normal gait despite diminished sensation from her mid-thighs to the toes. Moreover, Dr. Wischer Bailey's functional assessment is consistent with the normal neurologic exam findings documented by Dr. Abou-Elsaad in September 2015 and January 2020.

[Plaintiff's] primary care physician, Dr. Owens, completed a Treating Clinical Care Physician Statement in June 2017. She listed [Plaintiff's] diagnoses of cervical osteoarthritis, lumbar degenerative disc disorder, peripheral neuropathy, and bipolar disorder. Dr. Owens indicated [Plaintiff's] most significant clinical finding was loss of range of motion in the neck and back due to pain. She opined [Plaintiff's] pain and stress would frequently be severe enough to interfere with the attention and concentration needed to perform simple work tasks. She stated [Plaintiff] could not walk one city block or more without rest or severe pain; walk one block or more on rough or uneven ground; or climb steps without use of a handrail at a reasonable pace. Dr. Owens further opined [Plaintiff] need to lie down or recline "less than one hour" during an eight-hour workday. She stated [Plaintiff] could sit about four hours total and stand/walk about three hours total in an eight-hour workday. Dr. Owens indicated [Plaintiff] would need to take unscheduled work breaks every thirty minutes, with each break lasting fifteen to thirty minutes. She said [Plaintiff] did not need to elevate his legs or use an assistive device to walk. Dr. Owens found [Plaintiff] could rarely lift and carry up to fifteen pounds and never lift twenty pounds or more. She did not assess significant limiting with reaching, handling, or fingering. She estimated [Plaintiff] would be off-task more than 30% of the workday and absent from work five days or more per month. Finally, she commented [Plaintiff] was unable to obtain and retain work in a competitive work environment, eight hours per day, five days per week.

(R. at 411-413 (internal citations omitted).)

8

### III.     ADMINISTRATIVE DECISION

On January 24, 2022, the ALJ issued her decision.   (R. at 398-421.)   At step one of the sequential evaluation process,[3] the ALJ found that Plaintiff had not engaged in substantially gainful activity since December 12, 2014, the application date.   (R. at 403.)   The ALJ found that Plaintiff had the severe impairments of disorders of the lumbar and cervical spine; polyneuropathy; affective disorder; and anxiety.   (R. at 404.)   She further found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments described in 20 C.F.R. Part 404, Subpart P, Appendix 1.   (*Id.*)

Before proceeding to step four, the ALJ set forth Plaintiff's residual functional capacity ("RFC"), in pertinent part, as follows:

> [Plaintiff] has the residual functional capacity to perform medium work as defined in 20 CFR 416.967(c) except he can frequently climb ramps and stairs, but only occasionally climb ladders, ropes, and scaffolds. He can frequently reach in all directions with the left upper extremity and frequently push and/or pull with the left upper extremity. [Plaintiff] is limited to unskilled work with no strict time or

---

[3] Social Security Regulations require ALJs to resolve a disability claim through a five-step sequential evaluation of the evidence.   *See* 20 C.F.R. §416.920(a)(4).   Although a dispositive finding at any step terminates the ALJ's review, *see Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007), if fully considered, the sequential review considers and answers five questions:

1.     Is the claimant engaged in substantial gainful activity?

2.     Does the claimant suffer from one or more severe impairments?

3.     Do the claimant's severe impairments, alone or in combination, meet or equal the criteria of an impairment set forth in the Commissioner's Listing of Impairments, 20 C.F.R. Subpart P, Appendix 1?

4.     Considering the claimant's residual functional capacity, can the claimant perform his or her past relevant work?

5.     Considering the claimant's age, education, past work experience, and residual functional capacity, can the claimant perform other work available in the national economy?

*See* 20 C.F.R. §416.920(a)(4); *see also Henley v. Astrue*, 573 F.3d 263, 264 (6th Cir. 2009); *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001).

10

> production requirements and with only a few changes in routine. He can work in a nonpublic environment with superficial interaction with coworkers and supervisors, with "superficial" defined as no customer service duties, no negotiation, and no tandem tasks. He is able to remain on-task 96% of the work period.

(R. at 406.)   At step four of the sequential process, the ALJ determined that Plaintiff has no past relevant work.   (R. at 414.)   Relying on the VE's testimony, the ALJ concluded that Plaintiff can perform other jobs that exist in significant numbers in the national economy.   (R. at 414-415.)   She therefore concluded that Plaintiff was not disabled under the Social Security Act at any time since December 12, 2014, the date the application was filed.   (R. at 416.)

## IV.   STANDARD OF REVIEW

When reviewing a case under the Social Security Act, the Court "must affirm the Commissioner's decision if it 'is supported by substantial evidence and was made pursuant to proper legal standards.'"   *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007)); *see also* 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . .").   Under this standard, "substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"   *Rogers*, 486 F.3d at 241 (quoting *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).

Although the substantial evidence standard is deferential, it is not trivial.   The Court must "'take into account whatever in the record fairly detracts from [the] weight'" of the Commissioner's decision.   *TNS, Inc. v. NLRB*, 296 F.3d 384, 395 (6th Cir. 2002) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487 (1951)).   Nevertheless, "if substantial evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial

evidence in the record that would have supported an opposite conclusion.'" *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)). Finally, even if the ALJ's decision meets the substantial evidence standard, "'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers*, 582 F.3d at 651 (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007)).

## V. ANALYSIS

In his Statement of Errors, Plaintiff submits four assignments of error: (1) that the ALJ improperly evaluated the opinion evidence of record; (2) that the ALJ erred in assessing the functional limitation of superficial interaction with co-workers and supervisors; (3) that the ALJ erred in evaluating Plaintiff's part-time work as a delivery driver; and (4) that the ALJ asked improper hypothetical questions to the VE. (ECF No. 8 at PAGEID ## 938-942.) The Court will address each argument in turn.

### A. Medical Opinion Evidence.

Plaintiff's primary assignment of error is that the ALJ improperly evaluated opinion evidence throughout the record. (*Id.* at PAGEID ## 938-940.) It appears that Plaintiff generally takes issue with the ALJ's decision to give only "little weight" to Dr. Owens' June 2017 Treating Clinical Care Physician Statement ("Dr. Owens' Opinion") and the attached Functional Capacity Evaluation ("FCE") completed by Karen Scholl, PT. (*Id.*)

The ALJ must consider all medical opinions that he or she receives in evaluating a claimant's case. 20 C.F.R. § 416.927(c) ("Regardless of its source, we will evaluate every medical opinion we receive."). The applicable regulations define medical opinions as

"statements from acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions." 20 C.F.R. § 416.927(a)(1); *see also* SSR 96–8p, 1996 WL 374184, *7 (July 2, 1996) ("The RFC assessment must always consider and address medical source opinions.").

The ALJ generally gives deference to the opinions of a treating source "since these are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [a patient's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone . . . ." 20 C.F.R. § 416.927(c)(2); *Blakley*, 581 F.3d at 408. If the treating physician's opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in [the claimant's] case record, [the ALJ] will give it controlling weight." 20 C.F.R. § 404.1527(c)(2).

If the ALJ does not afford controlling weight to a treating physician's opinion, then the ALJ must meet certain procedural requirements. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004). Specifically, if an ALJ does not give a treating source's opinion controlling weight:

> [A]n ALJ must apply certain factors—namely, the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and the specialization of the treating source—in determining what weight to give the opinion.

*Id.*

Furthermore, an ALJ must "always give good reasons in [the ALJ's] notice of determination or decision for the weight [the ALJ] give[s] your treating source's opinion." 20

12

C.F.R. § 416.927(c)(2). Accordingly, the ALJ's reasoning "must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Friend v. Comm'r of Soc. Sec.*, 375 F. App'x 543, 550 (6th Cir. 2010) (internal quotation omitted). The United States Court of Appeals for the Sixth Circuit has stressed the importance of the good-reason requirement:

> "The requirement of reason-giving exists, in part, to let claimants understand the disposition of their cases," particularly in situations where a claimant knows that his physician has deemed him disabled and therefore "might be especially bewildered when told by an administrative bureaucracy that she is not, unless some reason for the agency's decision is supplied." *Snell v. Apfel*, 177 F.3d 128, 134 (2d Cir.1999). The requirement also ensures that the ALJ applies the treating physician rule and permits meaningful review of the ALJ's application of the rule. *See Halloran v. Barnhart*, 362 F.3d 28, 32–33 (2d Cir. 2004).

*Wilson*, 378 F.3d at 544–45. Thus, the reason-giving requirement is "particularly important when the treating physician has diagnosed the claimant as disabled." *Germany-Johnson v. Comm'r of Soc. Sec.*, 313 F. App'x 771, 777 (6th Cir. 2008) (citing *Rogers*, 486 F.3d at 242). There is no requirement, however, that the ALJ "expressly" consider each of the *Wilson* factors within the written decision. *See Tilley v. Comm'r of Soc. Sec.*, 394 F. App'x 216, 222 (6th Cir. 2010) (indicating that, under *Blakley* and the good reason rule, an ALJ is not required to explicitly address all of the six factors within 20 C.F.R. § 404.1527(c)(2) for weighing medical opinion evidence within the written decision). Finally, the Commissioner reserves the power to decide certain issues, such as a claimant's residual functional capacity. 20 C.F.R. § 404.1527(d). Although the ALJ will consider opinions of treating physicians "on the nature and severity of your impairment(s)," opinions on issues reserved to the Commissioner are generally not entitled to special significance. 20 C.F.R. § 404.1527(d); *Bass v. McMahon*, 499 F.3d 506, 511 (6th Cir. 2007).

13

Against that background, the ALJ provided the following discussion of Dr. Owens'

Opinion, and Ms. Scholl's accompanying FCE:

> [Plaintiff's] primary care physician, Dr. Owens, completed a Treating Clinical Care Physician Statement in June 2017. She listed [Plaintiff's] diagnoses of cervical osteoarthritis, lumbar degenerative disc disorder, peripheral neuropathy, and bipolar disorder. Dr. Owens indicated [Plaintiff's] most significant clinical finding was loss of range of motion in the neck and back due to pain. She opined [Plaintiff's] pain and stress would frequently be severe enough to interfere with the attention and concentration needed to perform simple work tasks. She stated [Plaintiff] could not walk one city block or more without rest or severe pain; walk one block or more on rough or uneven ground; or climb steps without use of a handrail at a reasonable pace. Dr. Owens further opined [Plaintiff] need to lie down or recline "less than one hour" during an eight-hour workday. She stated [Plaintiff] could sit about four hours total and stand/walk about three hours total in an eight-hour workday. Dr. Owens indicated [Plaintiff] would need to take unscheduled work breaks every thirty minutes, with each break lasting fifteen to thirty minutes. She said [Plaintiff] did not need to elevate his legs or use an assistive device to walk. Dr. Owens found [Plaintiff] could rarely lift and carry up to fifteen pounds and never lift twenty pounds or more. She did not assess significant limiting with reaching, handling, or fingering. She estimated [Plaintiff] would be off-task more than 30% of the workday and absent from work five days or more per month. Finally, she commented [Plaintiff] was unable to obtain and retain work in a competitive work environment, eight hours per day, five days per week.

> The undersigned acknowledges that Dr. Owens is [Plaintiff's] long-time primary care physician, which gives her a unique longitudinal perspective of [Plaintiff's] symptomatology. However, **her opinion is given little weight because it is not supported by her own physical exam findings and inconsistent with other significant objective evidence in the record**. As noted above, Dr. Owen's progress notes typically documented normal clinical findings. [Plaintiff] displayed tenderness and decreased range of motion in his neck and back after a motor vehicle accident in June 2017. However, [Plaintiff] only received conservative treatment for these conditions, and she did not even mention neck or back pain at a follow-ups with Dr. Owens in May 2018 and July 2019. In January 2020, Dr. Owens documented [Plaintiff's] normal strength and reflexes. She also noted he had no sensory deficits and normal coordination. [Plaintiff] reported worsening neuropathy in August 2020, but his muscle tone, coordination, and reflexes were all normal. He again complained of worsening neuropathy in February 2021. However, Dr. Owens started [Plaintiff] on Lyrica and [Plaintiff] reported significant improvement in his symptoms. Accordingly, **the vast majority of Dr. Owens' progress notes contain normal exam findings and are inconsistent with the significant functional limitations set forth in her Treating Clinical Care Physician Statement.**

14

**Furthermore, Dr. Owen's treating source statement is inconsistent with the clinical findings of Tamer Abou-Elsaad, M.D., a neurologist who examined [Plaintiff] on two occasions**. In September 2015, Dr. Abou-Elsaad diagnosed [Plaintiff] with peripheral neuropathy in September 2015. He noted [Plaintiff] displayed 5/5 motor strength in all four extremities with decreased sensation below the knees, decreased reflexes, and a steady gait. Dr. Abou-Elsaad conducted another neurological consult shortly after [Plaintiff's] alcohol-induced syncopal episode and seizure in January 2020. [Plaintiff's] physical exam was unremarkable. He exhibited 5/5 strength in all extremities, normal muscle tone, normal reflexes, normal coordination, normal sensation in the arms and legs, and a steady gait. Dr. Abou-Elsaad diagnosed [Plaintiff] with acute encephalopathy and recommended EEG testing. The EEG found no evidence of epileptiform discharges. **Dr. Abou-Elsaad's clinical findings – along with the neurologic exam findings recorded in the emergency department in December 2019 and January 2020 – did not support the sitting, standing, walking, lifting, and carrying limitations assessed by Dr. Owens.**

Dr. Owens attached a Functional Capacity Evaluation conducted by Karen Scholl, PT on June 7, 2017 in support of her medical source statement. Ms. Scholl noted [Plaintiff's] decreased sensation to pinprick and light touch in her lower extremities. She also noted [Plaintiff's] unsteady gait pattern and slowed fine motor skills. Ms. Scholl saw [Plaintiff] one time and did not establish a treatment relationship with him. Dr. Owens did not incorporate Ms. Scholl's abnormal findings regarding [Plaintiff's] fine motor skills into her functional assessment. **Additionally, Ms. Scholl's exam findings are inconsistent with the majority of the clinical findings noted throughout the file.** The undersigned notes that Dr. Wischer Bailey, documented some abnormal exam findings at the consultative exam in September 2015, including diminished pinprick and light touch sensation in the left upper extremity and lower extremities as well as bilateral hand tremors. However, Dr. Wischer Bailey indicated [Plaintiff's] peripheral neuropathy was related to alcoholism, and she suggested that sobriety would be beneficial. **Overall, there is little objective evidence consistent with Ms. Scholl's Functional Capacity Evaluation, and Dr. Owens' reliance on said report was misplaced.**

**Finally, there is no objective support for Dr. Owens' estimates about [Plaintiff] time off-task and absenteeism. Moreover, her conclusory statement that [Plaintiff] was "unable to obtain and retain work in a competitive work environment" improperly intrudes on the Commissioner's sole discretion to determine whether a claimant is able to perform regular or continuing work. Statements on issues reserved to the Commissioner are inherently neither valuable nor persuasive.**

(R. at 412-414 (emphasis added; internal citations omitted).)

15

Plaintiff argues that with the above analysis, "the ALJ also did not give good reasons for rejecting [Dr. Owens'] disabling limitations," and appears to refer to the Court's previous remand of this case, implicitly suggesting that the ALJ repeated the same errors on remand.   (ECF No. 8 at PAGEID # 938 (citing R. at 492).)   This argument is not well taken.   When the Court previously reviewed Plaintiff's claim, presiding Magistrate Judge Bowman found that "the ALJ's articulated reasons for rejecting Dr. Owens' opinions [did] not constitute 'good reasons' for rejecting all of her findings," for two distinct reasons.   (R. at 492.)   First, Magistrate Judge Bowman concluded that the ALJ had "overlooked or ignored portions of the record which were consistent with the opinions of Dr. Owens."   (*Id.*)   Magistrate Judge Bowman held that "it appears . . . the ALJ, in part, impermissibly acted as her own medical expert " by ignoring such evidence, and that "this type of selective review cannot support a conclusion that the ALJ's decision was supported by substantial evidence."   (R. at 492-493.)   Additionally, Magistrate Judge Bowman held that "it appears that the ALJ applied a more rigorous scrutiny to Dr. Owens' opinions than to those of the nonexamining opinions," which "is precisely the inverse of the analysis that the regulation requires."   (R. at 494.)   Presiding District Judge Barrett adopted Magistrate Judge Bowman's analysis, specifically noting that Dr. Owens' opinion was consistent with Dr. Bailey's opinion, diagnostic imaging throughout the record, and Dr. Abou-Essad's opinions.   (R. at 479-481 ("Therefore, there were portions of the record [which] were consistent with the opinions of Dr. Owens.").)   Accordingly, the Court remanded under sentence four of 42 U.S.C. § 405(g).   (R. at 478-481.)

On remand, however, the ALJ properly cured these deficiencies and set forth "good reasons" for only affording "little weight" to Dr. Owens' opinion.   For example, the Court previously found that the ALJ "overlooked or ignored" evidence of "pinprick in [Plaintiff's] legs,

16

peripheral neuropathy, degenerative disc disease and radiculopathy," as well as the opinions of physical therapist Karen Scholl and the State agency examining physician Dr. Bailey. (R. at 480.) But on remand, the ALJ did not overlook this evidence. Instead, the ALJ repeatedly acknowledged Plaintiff's "decreased sensation to pinprick," Plaintiff's complaints of "worsening neuropathy," Dr. Owens' diagnoses of lumbar degenerative disc disorder and peripheral neuropathy, and the opinions of Ms. Scholl and Dr. Bailey. (R. at 410-412.)

Even when considering this consistent evidence, the ALJ provided sufficient reasons for discrediting Dr. Owens' opinion. First, the ALJ found that Dr. Owens' opinion was "not supported by her own physical exam findings and inconsistent with other significant objective evidence in the record," specifically contrasting Plaintiff's complaints of "worsening neuropathy" with the "significant improvement" Plaintiff reported to Dr. Owens once he began taking Lyrica, and highlighting the fact that Dr. Owens' own records "typically documented normal clinical findings." (R. at 413.) The ALJ also noted that even when Plaintiff "reported worsening neuropathy in August 2020 . . . his muscle tone, coordination and reflexes were all normal." (*Id.*) To this end, the ALJ also correctly noted that "the vast majority of Dr. Owens' progress notes contain normal exam findings and are inconsistent with the significant functional limitations set forth in her [opinion]." (*Id.*) And the ALJ also appropriately found that while Ms. Scholl and Dr. Bailey noted Plaintiff's "decreased sensation to pinprick" and peripheral neuropathy, the ALJ provided important context for Dr. Bailey's findings, noting that Dr. Bailey "indicated [Plaintiff's] peripheral neuropathy was related to alcoholism, and [] suggested that sobriety would be beneficial." (R. at 414.) The ALJ further discussed Ms. Scholl's opinion, noting that Ms. Scholl only "saw [Plaintiff] one time and did not establish a treatment relationship with him" and that the ALJ's "reliance on [Ms. Scholl's report] was misplaced."

(R. at 414.)   Accordingly, the Court cannot again conclude that the ALJ "impermissibly acted as her own medical expert" by both confronting this evidence and discussing why it was unreliable.

Additionally, the ALJ also provided in depth analysis of the remaining evidence throughout the record that was *inconsistent* with Dr. Owens' opinions.   For example, the ALJ again contrasted Dr. Owens' opinion with that of examining neurologist Dr. Abou-Elsaad, noting that "Dr. Abou-Elsaad's clinical findings – along with the neurologic exam findings recorded in the emergency department in December 2019 and January 2020 – did not support the sitting, standing, walking, lifting, and carrying limitations assessed by Dr. Owens."   (R. at 413-414.)

All in all, the Court has no qualms about concluding that the ALJ's analysis of Dr. Owens' opinion was "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Friend*, 375 F. App'x at 550 (internal quotation omitted).   The ALJ meticulously explained, over approximately two pages in her decision, why she believed Dr. Owens' opinion was not supported by her own clinical findings and was not consistent with the balance of the medical evidence in the record.   (R. at 412-414.)   The Court agrees, and finds that the ALJ's resulting RFC is properly supported by substantial evidence throughout the record.   Accordingly, Plaintiff's first assignment of error is not well taken.

**B.       Superficial Interactions.**

For his second assignment of error, Plaintiff submits that the ALJ erred by finding "no public contact and superficial interaction with co-workers and supervisors, defining superficial as no customer service duties, negotiation or tandem tasks."   (ECF No. 8 at PAGEID ## 940-941.) The Court disagrees.

In setting forth Plaintiff's RFC, the ALJ found that Plaintiff "can work in a nonpublic environment with superficial interaction with coworkers and supervisors, **with 'superficial' defined as no customer service duties, no negotiation, and no tandem tasks**" and that Plaintiff "is able to remain on-task 96% of the work period." (R. at 406 (emphasis added).) Courts throughout the Sixth Circuit have explicitly recognized that "superficial" and "occasional" interactions are not "interchangeable," and "occasional" contact goes to the quantity of time spent with individuals, whereas "superficial" contact goes to the quality of the interactions. *Lindsey v. Comm'r of Soc. Sec.*, No. 2:18-cv-18, 2018 WL 6257432, at \*4 (S.D. Ohio Nov. 30, 2018) (quoting *Hurley v. Berryhill*, No. 1:17-CV-421-TLS, 2018 WL 4214523, at \*4 (N.D. Ind. Sept. 5, 2018)), *report and recommendation adopted*, 2019 WL 133177 (S.D. Ohio Jan. 8, 2019); s*ee also Redd v. Comm'r of Soc. Sec*., No. 1:20-cv-222, 2021 WL 1960763, at \*4 (W.D. Mich. May 17, 2021) ("With regard to social limitations, courts have distinguished limitations that concern the quality or nature of interactions from limitations that concern the quantity of time involved with those interactions.") (internal quotations and citations omitted). For that reason, courts in this Circuit routinely find that an ALJ may not replace a social functioning limitation regarding "superficial" interactions with one regarding "occasional" interactions, absent explanation. *See e.g*., *Corey v. Comm'r of Soc. Sec*., No. 2:18-cv-1219, 2019 WL 3226945, at \*4 (S.D. Ohio, July 17, 2019) (remanding because "where, as here, the ALJ assigns significant weight to a particular opinion and states it is consistent with the record, he must incorporate the opined limitations or provide an explanation for declining to do so[,]" otherwise, the court is unable to "conduct[] meaningful review to determine whether substantial evidence supports his decision"). But here, the ALJ provided such explanation by expressly defining "superficial" as "no customer service duties, no negotiation, and no tandem tasks." (R.

19

at 406.)   And as the Commissioner correctly observes, these limitations inherently go to the *quality* (not the quantity of time) of Plaintiff's interactions.   Accordingly, there is no error in the ALJ's limitation.

Plaintiff contends that the "quality or quantity" analysis is flawed, because if a worker hypothetically "argues with the boss or the co-workers for one hour at a time each day, this would be only one distraction, but it would keep the worker off-task and unproductive for 1/8 of the work day."   (ECF No. 8 at PAGEID # 940; ECF No. 12 at PAGEID # 971.)   This appears to be an attack on the state of the Sixth Circuit jurisprudence regarding "occasional" and "superficial" limitations.   The Court, however, cannot entertain Plaintiff's attack on this settled issue.   Further, Plaintiff fails to explain how he believes the ALJ erred in defining the "superficial" limitations.   For these reasons, Plaintiff's second assignment of error is not well taken.

**C.    Plaintiff's Part-Time Work for Door Dash.**

Next, Plaintiff submits that the ALJ "improperly [relied] on evidence outside the record" in analyzing Plaintiff's part-time work delivering for Door Dash in 2021.   (ECF No. 8 at PAGEID ## 941-942.)   The ALJ discussed Plaintiff's part-time work as a Door Dash delivery driver as follows:

> Moreover, [Plaintiff] worked part-time as a Door Dash delivery driver in 2021. This work activity suggests the claimant could perform sustained sitting, turn the steering wheel, turn his head in all directions, and operate foot controls, as well as the torque and strength required to turn the steering wheel.

(R. at 408 (internal citation omitted).)   While Plaintiff's exact argument is not quite clear, the Court believes that Plaintiff takes issue with the ALJ's assumption that Plaintiff's work activity "suggests the claimant could perform sustained sitting, turn the steering wheel, turn his head in

all directions, and operate foot controls, as well as the torque and strength required to turn the steering wheel."  (ECF No. 8 at PAGEID # 941 ("Where in the record is the evidence of 'sustained sitting' and 'turning the head' on this?").)   Plaintiff again appears to compare this analysis to the ALJ's previous decision, in which the ALJ found Plaintiff not to be disabled, in part because of Plaintiff's television watching habits.   (*Id.*)

Plaintiff's argument is not well taken.   First, the ALJ merely observed that such part-time work "suggest[ed]" that Plaintiff could perform the basic functions of driving.   (R. at 408.) The ALJ did not reach any definitive conclusions on the issue, and only discussed Plaintiff's work activity in passing as one of "several consistency issues with [Plaintiff's] subjective allegations about his symptoms."   (*Id.*)   Regardless, the ALJ's discussion is corroborated in the record by Plaintiff's own testimony during the January 13, 2022 hearing, as Plaintiff confirmed that he would, at least at times, drive his own car when he was delivering food for Door Dash:

> Q:    Okay, thanks. Yeah, thank you. Ron, on that work you did last year for DoorDash, you were delivering orders for people. Was anyone else going along with you to deliver?
>
> A:    Yes. I'm sorry, go ahead.
>
> Q:    Well, so someone else was in the car with you delivering?
>
> A:    Yes, my next door neighbor. She's retired and --
>
> Q:    Okay. Okay. And did she drive for a time?
>
> A:    Well, if -- she'd do the -- she was on and off. You know, if I got bad, she'd tell me to pull over, because sometimes I can't brake or gas. I can't distinct [sic] which is which, and that's when she'd she, let met take over and --
>
> Q:    Okay. And --
>
> A:    -- drive.

(R. at 441-442.)   This confirms (at least to some degree) the ALJ's statement that Plaintiff was

capable of performing basic driving functions when he worked for Door Dash.   Accordingly, the

Court finds no error with the ALJ's discussion of Plaintiff's work for Door Dash.   Plaintiff's

third assignment of error is not well taken.

> ### D.   VE Questioning.

Finally, Plaintiff argues that the ALJ's questions to the VR at the January 13, 2022

hearing were "improper" because "they asked for medium work when Dr. Bailey's limitations

and those of Dr. Owens do not allow for this."   (ECF No. 8 at PAGEID # 942.)   This

assignment of error is therefore inextricably linked to Plaintiff's first assignment of error, that the

ALJ improperly discounted the opinions of Drs. Bailey and Owens.   But as discussed above,

however, the Court finds that the ALJ reasonably discounted Drs. Bailey and Owens' limitations,

and that the ALJ's RFC is supported by substantial evidence throughout the record.   Because the

ALJ's hypothetical questions to the VE were consistent with her RFC, the ALJ there can be no

error.   *King v. Comm'r of Soc. Sec.*, No. 20-3276, 2020 WL 8772400, at *6 (6th Cir. Nov. 25,

2020), *cert. denied sub nom. King v. Saul*, 141 S. Ct. 2869 (2021) ("Because the ALJ's RFC

determination was supported by substantial evidence, the ALJ could rely on the VE's testimony

that [Plaintiff] could perform the limited light work described in [the ALJ's] hypothetical."); *Lee

v. Comm'r of Soc. Sec.*, 529 F. App'x 706, 715 (6th Cir. 2013) ("An ALJ is only required to

incorporate into a hypothetical question those limitations he finds credible.") (citing *Casey v.

Sec'y of Health & Human Servs.,* 987 F.2d 1230, 1235 (6th Cir. 1993)).   Accordingly, Plaintiff's

fourth assignment of error is not well taken.

> ## VI.   CONCLUSION

In sum, from a review of the record as a whole, the Court concludes that the ALJ's

decision denying benefits is supported by substantial evidence and was made pursuant to proper

legal standards. Based on the foregoing, Plaintiff's Statement of Errors (ECF No. 8) is

**OVERRULED** and the Commissioner's decision be **AFFIRMED.**   The Clerk is **DIRECTED**

to enter judgment accordingly.

       **IT IS SO ORDERED.**

Date: October 20, 2022           */s/ Elizabeth A. Preston Deavers*
                       **ELIZABETH A. PRESTON DEAVERS**
                       **UNITED STATES MAGISTRATE JUDGE**